## COMMONWEALTH *VS.* RALPH RICHARDS.

No. 99-P-1146.

Plymouth. December 5, 2000. - December 4, 2001.

Present: PERRETTA, JACOBS, & GELINAS, JJ.

*Practice, Criminal,* Instructions to jury. *Identification. Evidence,* Identification, Credibility of witness. *Witness,* Credibility.

There was no merit to a criminal defendant's contention that he was entitled to a required finding of not guilty on an indictment charging him with armed robbery because the Commonwealth failed to show that the victim was in fear and that property was taken from her person. [337]

At the trial of indictments charging the defendant with three armed robberies, the judge's instructions on the credibility of witnesses constituted an improper endorsement of the testimony of the Commonwealth's witnesses and, viewed in combination with the judge's erroneous refusal to instruct specifically on, or to convey sufficiently the concept of, the possibility of a good faith but mistaken identification, the errors in the instructions could not be deemed harmless. [337-341]

INDICTMENTS found and returned in the Superior Court Department on September 9, 1997.

The cases were tried before *Mitchell J. Sikora,* J.

*Alba Doto Baccari* for the defendant.

*Mary E. Lee,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. After a jury found the defendant guilty on indictments charging him with three armed robberies, see G. L. c. 265, § 17, the judge found him guilty of being a habitual offender. See G. L. c. 279, § 25.[1] On appeal from these convictions, the defendant claims error in the jury instructions, and in the judge's

---

[1] Each indictment charging the defendant with armed robbery contained a separate count alleging that he was a habitual offender. After the jury found him guilty on each of the armed robbery charges, the defendant waived his right to a jury trial on the habitual offender counts of the indictments which were brought under G. L. c. 279, § 25.

denial of his motion for a required finding of not guilty on one of the three armed robbery indictments. Although we determine that the judge correctly denied the motion for a required finding of not guilty, we also conclude that his jury instructions were tainted by error which requires reversal of the convictions.[2]

1. *The evidence.* As related by Jodie Kelly, a cashier at a Purity Supreme supermarket located in Brockton, her work for the day of September 18, 1995, was completed at about 7:15 P.M. As she was cashing out her register, a man came up to her and informed her that she had a problem, that he was going to take the money in her register drawer. The man pulled a Purity Supreme bag and a black gun from an inner pocket of his jacket. Although the man held the gun close to his chest, Kelly was able to see the handle of the gun and part of its barrel before the man returned the gun to his pocket and handed the bag to Kelly.[3]

At this point Charlene Santo, the market's customer service manager, came up behind Kelly and asked whether something was wrong. The man confirmed the existence of a problem, told Kelly and Santo to put the money from the register into the bag that he had handed to Kelly, and opened his jacket to reveal the handle of a gun. The women filled the bag with currency amounting to somewhere between $500 and $1,000 and gave it to the man. They remained stationary as the man turned and slowly walked from the store. All told, the robbery occurred within a time span of about sixty to ninety seconds. Upon the robber's departure from the store, Kelly and Santo summoned the police.[4]

Kelly testified that the robber was about five feet, six inches in height and had a small to average frame as well as gray hair. He wore a dark leather jacket and a gray golf cap and was somewhere between his late fifties or early sixties. Santo described the rob-

---

[2] There is a third argument, that the judge erred in refusing to ask the jurors whether they had seen a newspaper article published during trial in which the defendant was referred to as an "ex-con." Because this issue is unlikely to arise at any retrial, we do not consider it.

[3] Although it was ultimately determined that the gun was not real, Kelly believed that it was.

[4] It is the events of September 18, 1995 — the armed robberies of Kelly and Santo — that provide the basis for two of the three armed robbery charges.

ber as about five feet, four inches in height, having a small build as well as "salt and pepper" hair. She estimated his age as "in his fifties."

Alicia Dupuy, a cashier at a CVS store in West Bridgewater, related that on October 8, 1995, at about 3:30 P.M., she was working in one of the aisles of the store when a man asked her for assistance. To accommodate his request for change, she walked to the front of the store and stood behind the register. When Dupuy opened the register, the man handed her a pink and white cloth bag, opened his jacket to display a black gun, and ordered her to fill the bag with money.

As Dupuy was filling the bag with currency from the register, a customer came up from behind the robber. This customer, Steven Blanchette, a district manager for CVS, testified that on the date in issue, October 8, 1995, he had been shopping at CVS with his young daughter. He related that he saw a man leaning on the counter as the cashier put money from the register into a pink bag. At this point, Blanchette instructed his daughter to go and look at the merchandise set out for Halloween.

Once his daughter did as he instructed, Blanchette proceeded to the register, stood behind the man at the counter, and asked what he was doing. The man looked at Blanchette, put his hand to his jacket, and told him to step back for his own safety. Blanchette assumed that the man had a gun in his jacket and took a step back so that he stood at an angle to the robber's left. As the cashier filled the bag with money, the robber again ordered Blanchette to step back.

When the bag was filled, the robber began to walk out of the store. Blanchette tried to follow him, but the robber warned him to stay back. Blanchette and Dupuy then watched the robber leave the store and get into the passenger side of a small gray and black pickup truck. Blanchette called the police as the driver of the truck drove off.

According to Dupuy, the robber was an older man, having gray hair and bushy eyebrows. He wore a brown leather jacket, jeans, and a "scully" cap. Blanchette said that the robber had bushy eyebrows and wore glasses.

Aided by the description of the truck and the robber, the police located the truck within two hours of the robbery. While keeping the truck under surveillance, the police saw two men,

the defendant and Robert Varrieur, leave a nearby house and walk toward the vehicle. As events not relevant to the issues raised on appeal turned out, the police ascertained that Varrieur resided in the second floor of the house and had on his person a set of keys to the truck. They arrested the two men and gave them their Miranda warnings.

As related by Raymond Rogers, one of the law enforcement officials present at the scene of the arrest of the defendant and Varrieur, the defendant informed the police that he lived with his brother about three miles away from the scene of his arrest. He first professed that he had been at Varrieur's apartment the entire day but then claimed that he had been with his family throughout the relevant time period. When the police told him that the truck would be tested for fingerprints, he volunteered that he had worked on the truck "about a thousand times." At the time of the defendant's statements to the police, he was wearing a black "scully" cap and had on his person $110 in currency. Upon entering Varrieur's apartment, the police found a brown leather jacket with a fake black handgun in one of the pockets and a pink and white cloth bag and a gray "scully" cap stuffed in the left sleeve.

There was also evidence to show that the defendant was five feet, seven inches tall, weighed about 125 pounds, wore eyeglasses, and was about fifty-nine years of age, whereas Varrieur was about five feet, eleven inches in height, was "emaciated," walked with difficulty, and did not wear eyeglasses. His eyebrows did not appear to be bushy.

About a month after the Brockton robbery, the police compiled two photo arrays. The first consisted of nine photographs of older white males. The defendant was depicted in photograph number six. After studying the array for about five minutes, Kelly eliminated all the photographs except numbers three and six. As between those two, she was more inclined to select photo number six, but she could not be positive. Santo was shown the two arrays. She selected number 6 from the first array and no one from the second array in which a photo of Varrieur appeared.

At trial, Kelly identified the defendant as the robber, stating that she recognized his face. However, Santo testified that she was unable, at trial, to identify the defendant as the robber and

that, although she had selected his photo from the array shown to her one month after the robbery, she had not stated at that time that she was positive that the person depicted in photo number six was the robber.[5]

We summarize. Of the four witnesses to the robberies, two (Kelly and Blanchette) positively identified the defendant at trial as the robber. As between these two, one (Kelly) was unable to make a positive identification of the defendant when, one month after the robbery, she was shown an array of photographs that included his picture. On the other hand, Santo testified that she could not identify the defendant as the robber and disavowed that her identification of the defendant from the array of photographs shown to her one month after the robbery was positive. Dupuy testified that she did not recognize the defendant as the robber.

2. *The motion for a required finding.* It is the defendant's contention that he was entitled to a required finding of not guilty on the indictment charging him with the armed robbery of Santo. He claims that the Commonwealth failed to show that Santo was in fear and that property was taken from her person. We think this argument warrants no discussion and is disposed of for the reasons set out in *Commonwealth* v. *Grassa*, 42 Mass. App. Ct. 204, 206-208 (1997), and cases therein cited.

3. *The jury instructions.* At the conclusion of the evidence, the defendant asked the trial judge to instruct the jury on the possibility of an honest but mistaken identification. See *Commonwealth* v. *Pressley*, 390 Mass. 617, 619-620 (1983). He refused to do so, and instead instructed:

> "[W]e examine the evidence of the quality of the identification by a witness and we ask ourselves what op-

---

[5]The Commonwealth was allowed to impeach Santo's credibility with her testimony from the defendant's first trial which ended in a mistrial "on the basis of publicity." The defendant argues that, although the Commonwealth had the right to rehabilitate its witness, it was error to allow her to be impeached. The Commonwealth counters that the defendant declined the trial judge's offer to give a limiting instruction to the jury and that Santo was provided ample opportunity to explain any inconsistencies in her statements. We do not consider whether Santo was improperly impeached as a separate and distinct claim of error. Rather, we take note of her testimony in its entirety in light of the jury instructions taken as a whole.

portunity did that weakness [*sic*] have to observe the defendant. What opportunity did the witness have to observe the defendant?

"We take into consideration such common sense factors as how long did the witness have a chance to observe a defendant. What were the lighting conditions at the time of the observation? Was the witness distracted in any way during that observation? Were there any other influences working on the witness's mind at the time of the observation? And was there anything suggestive, was there anything suggestive that caused the witness to be too ready to identify the defendant. So we examine in a common sense way very carefully the quality of the evidence in identification."

The defendant objected to the judge's refusal to give the requested instruction.

Relying upon *Commonwealth* v. *Payne*, 426 Mass. 692, 698 (1998), the Commonwealth argues that the trial judge's instructions, taken as a whole, were sufficient to inform the jury about the possibility of a good faith but mistaken identification. There the trial judge instructed that, "[I]t is possible for a witness on the stand making an identification to be mistaken. That is a possibility and it is something that must be guarded against." He added that he "want[ed] to make it very clear that, of course, our law does recognize that identifications can be the result of an honest mistake as well as a complete falsehood." The court held that the instructions "sufficiently conveyed the legal concept of a good faith, mistaken identification." *Ibid.* We think the present case a far cry from *Payne* and that the judge's instructions cannot be construed as similarly conveying the essence of a *Pressley* instruction.

Moreover, the judge's instructions, taken as a whole, contained numerous other errors that only exacerbated the effect of his erroneous refusal to inform the jury on the possibility of a good faith but mistaken identification.[6] Preliminarily instructing the jury on the first day of trial, the judge defined evidence

---

[6]The defendant did not object to these numerous errors and now argues that they created a substantial risk of a miscarriage of justice. Rather than decide whether these errors, standing alone, would require reversal of the defendant's

as being "information of a reliable quality," "information of a very high quality," information that is "relevant and reliable and non-prejudicial."[7] He likened a trial judge's role to that of a filter that acts to ensure that the jury's verdict will be based only on "high quality" information.[8]

This "high-quality" and "filter" theme was carried over into the final instructions to the jury. Because the defendant presented no evidence, the jury was to decide his guilt or lack thereof on the basis of the Commonwealth's witnesses. In delivering his final instructions to the jury, the trial judge repeated his preliminary jury instructions about "high-quality" evidence and the "filter" role of the trial judge and stated:

> "[T]he evidence consists of very high quality information which we have permitted to come before you. . . . The evidence comes directly from the source to you from the testimony here at the witness stand and from the exhibits which we have admitted through the testimony of the

---

convictions, we look to them to the extent they relate to the issue of identification in determining whether the judge's erroneous refusal to give the requested *Pressley* instruction was harmless error.

[7] In defining evidence, the trial judge stated:

> "[E]vidence is very precise. Remember, evidence is information of a high quality. No hearsay. No rumor. No guesswork. It is information that must have a very high quality. It must be relevant and reliable and non-prejudicial. . . . By non-prejudicial, we mean it must be fair. It must not unduly bring in other circumstances that aren't relevant to our case and which could harm your view of one of the parties or of a witness. So that is the meaning of the evidence."

[8] The trial judge explained:

> "[T]he law says until a judge permits something into evidence the jury should not be exposed to it because it could be irrelevant, it could be unreliable, it could be prejudicial. So the law says that the judge must act as a filter, and this filtration system goes on so that the judge makes sure that the jury for its verdict has only high quality information upon which a reliable verdict can be based.

> "So please know that when we're having our conferences over at the other end of the bench, we're doing that kind of filtering process. We're obeying the rules of evidence and we are being fair and making sure that we have a reliable, impartial, verdict."

witnesses. . . . And so we know that the evidence consists of this high quality information that we've permitted to come in, permitted to be considered by you."

Even were we to assume that it was proper to characterize evidence in general in terms of "high quality information" rather than as information determined to be admissible under the rules of evidence, we think the trial judge here went too far when he characterized the evidence in *this* case, which came solely from the Commonwealth's witnesses, as being of "high quality."

Further, the trial judge's general instructions on the credibility of witnesses were flawed for the reasons discussed in *Commonwealth v. Caramanica*, 49 Mass. App. Ct. 376, 379-380 (2000), decided subsequent to the trial in this case. The judge stated:

> "The particular skill of juries is to determine the credibility of witnesses; that is, how *reliable* was the testimony of a witness? Sometimes credibility is used to refer to the truthfulness or untruthfulness of particular testimony. But more often, it's used to refer to the general *reliability* of a witness.
>
> "Very few witnesses come to court with the conscious intent to mislead or to lie. However, very often witnesses in good faith and to the best of their memory give different versions of events. That's simply because of differences in perception, differences in memory, and sometimes differences of unconscious subjectivity. They just seem to remember things differently. But very often, they believe that they are telling the truth to the best of their knowledge and to the best of their ability" (emphasis supplied).[9]

The errors in the instruction were thematic rather than fleeting and, taken as a whole, constituted an improper endorsement of the testimony of the Commonwealth's witnesses which usurped the jury's obligation to determine what testimony they would believe and how much weight they would give to the

---

[9]It should be remembered that moments earlier, the judge had instructed the jury that they had been presented with only "high quality" evidence which he had defined at the outset of the trial as "relevant and *reliable* and non-prejudicial" (emphasis supplied). See notes 7 and 8, *supra.*

evidence presented. See *Commonwealth* v. *Cohen*, 27 Mass. App. Ct. 1210, 1210 (1989), citing *Commonwealth* v. *Barry*, 9 Allen 276, 279 (1864). Viewed in combination with the judge's erroneous refusal to instruct specifically on or to convey sufficiently the concept of the possibility of a good faith but mistaken identification, see note 6, *supra*, the errors in the instructions cannot be deemed harmless.

*Judgments reversed.*

*Verdicts and findings*
*set aside.*